59 So.3d 548 (2011)
STATE of Louisiana, Appellee
v.
Charles Benjamin CAMP, Appellant.
No. 46,052-KA.
Court of Appeal of Louisiana, Second Circuit.
March 16, 2011.
Rehearing Denied April 7, 2011.
*550 Kammer & Huckabay by Charles H. Kammer, III, Shreveport, for Appellant.
Charles R. Scott, II, Caddo Parish District Attorney, Jason Brown, R. Bennett Langford, III, Caddo Parish Assistant District Attorneys, for Appellee.
Before STEWART, CARAWAY and PEATROSS, JJ.
CARAWAY, J.
Defendant was convicted by a jury of communicating false information of planned arson, a violation of La. R.S. 14:54.1. He now appeals, arguing that there was insufficient evidence to convict and that the trial court erred in allowing the use of other crimes evidence during voir dire and at trial. He additionally alleges ineffective assistance of his trial counsel. For the following reasons, his conviction and sentence are affirmed.

Facts
On July 20, 2007, at approximately 4:30 in the afternoon, Charles Benjamin Camp ("Camp") phoned Horseshoe Casino in Bossier City, Louisiana, to inquire about his entitlement to a "comp," or complimentary meal, at the Jack Binion Steakhouse located in the casino. Jessie Henson, in charge of reservations at the time for Horseshoe, answered the phone call. Camp identified himself and his "player card" in order for Henson to determine if he was eligible for a comp meal. After verifying his background information, including his date of birth and address, Henson informed Camp that his "comp bucket" did not qualify him for a meal at the steakhouse or any other casino restaurant. A "comp bucket" is a tool used by the casino to track a patron's level of play. Depending on how much a parton plays, money is added to the bucket which can then be used for meals, hotel stays, and merchandise at the casino's gift shops.
After Camp was informed that he did not have enough in his comp bucket for the free meal, he grew agitated and asked Henson, "Can you seemy winnings and my losses?" Camp complained that he had been frequenting the Horseshoe Casino for a long time, spending his money *551 and that he expected something in return. Henson noted that Camp sounded as if he were intoxicated. She attempted to apologize and explain that there was nothing she could do. According to Henson's testimony, Camp then proceeded to state, "I'm going to come down there and burn that goddamn place down and you." At this point, Henson immediately hung up the phone. Although she was not particularly frightened, she was uncomfortable with the exchange and reported the call to her manager and to casino security.
Destry Thompkins, the security officer on duty at the Horseshoe Casino, interviewed Henson and compiled a report of the incident approximately 12 minutes after the phone call took place. In his report, Thompkins indicates that Camp told Henson, "I ought to burn that m____ f____down." Horseshoe security additionally notified the Gaming Division of the Louisiana State Police and Trooper Phillip Krouse responded. Henson was directed by Trooper Krouse to prepare a written statement. In her statement to Trooper Krouse, Henson related that Camp told her, "I'm going to come up there and burn that goddamn place and you."
Subsequent to the telephone exchange with Henson, Camp was permanently banned from the Horseshoe casino. An investigation into Camp's prior interactions with the casino revealed that previously, on February 4, 2004, Camp was evicted from the casino for 24 hours for verbally abusing and physically threatening casino employees and customers.
On August 15, 2007, approximately three weeks after the incident, Trooper Krouse obtained a warrant and Camp was arrested. He was charged, by bill of information, with communication of false information of planned arson, a violation of La. R.S. 14:54.1.[1]
Camp originally retained attorney John Stephens to represent him; however, in the summer of 2009, Camp retained the services of a second attorney, Melissa Sugar, who was simultaneously representing him in his civil suit. Because Stephens and Camp disagreed on the appropriate defense strategy, Sugar was designated as lead counsel.
A jury trial was commenced on February 8, 2010. The jury heard from various witnesses who testified to their knowledge of the incident. The jury was also presented with evidence of Camp's prior 24-hour eviction from Horseshoe Casino and two other phone conversations in which Camp became angry and agitated. One of the phone conversations, recorded and played for the jury, contained a similar threat to burn down a local newspaper.
During the trial, the defense attempted to present evidence of a conspiracy to prosecute Camp for his involvement in a plan to unravel illegal and unethical behavior that occurred during a local election. Evidence was presented that Camp was arrested on the same day he threatened to go to the local news media to disclose the improper behavior. The defense highlighted the delay time between the actual incident on July 20, 2007, and the subsequent arrest on August 15, 2007. However, Trooper Krouse testified that this discrepancy arose because he was on a detail in New Orleans arising out of Hurricane Katrina and was unable to thoroughly investigate the matter until the later date. Ted Riser, the former Sheriff of *552 Webster Parish, testified that he attempted, unsuccessfully, to assist Camp in recovering public records from the Louisiana Attorney General concerning Camp's allegations of the election misconduct. He additionally testified that he was present when Camp threatened to go to the media and when Camp was arrested later that day.
At the conclusion of the trial, 10 members of the 12-member jury found Camp guilty as charged. Camp subsequently retained new counsel, Charles Kammer, and both Sugar and Stephens withdrew. On April 19, 2010, Kammer filed a motion for new trial on Camp's behalf, alleging ineffective assistance of counsel. After a hearing, this motion was denied.
On April 21, 2010, Camp was sentenced to serve five years' imprisonment at hard labor, all but one of which were suspended in favor of five-year supervised probation. The trial court imposed a variety of conditions, including the completion of a substance abuse program and an anger management program.
Camp now appeals his conviction and once again urges his claim of ineffective assistance of counsel.

Discussion

I.
Camp first argues that there was insufficient evidence to convict him of the crime of communication of false information of planned arson. Specifically, he contends that Henson made differing statements about what Camp said and that she hung up the phone midway into the conversation. Moreover, Camp argues that the state failed to prove that the threat was actually false, as required under the statute.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
The Jackson standard, now legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833, writ denied, 09-0310 (La.11/6/09), 21 So.3d 297.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 09-0725 (La.12/11/09), 23 So.3d 913, cert. denied, 130 S.Ct. 3472, 177 L.Ed.2d 1068, 78 USLW 3743 (2010); State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 07-1209 (La.12/14/07), 970 So.2d 529.
La. R.S. 14:54.1 provides, in part:
A. Communicating of false information of arson or attempted arson is the intentional impartation or conveyance, or *553 causing the impartation or conveyance by the use of the mail, telephone, telegraph, word of mouth, or other means of communication, of any threat or false information knowing the same to be false, including bomb threats or threats involving fake explosive devices, concerning an attempt or alleged attempt being made, or to be made, to commit either aggravated or simple arson.
The plain wording of the statute makes it clear that only false threats are covered. The gravamen of the crime is not concern over the potentially life-threatening consequences of a real bombing, but rather the potential inconvenience and/or disruption and alarm that can be caused by creating the perception, albeit false, that a real bombing might be afoot. State ex rel. R.T., 00-0205 (La.2/21/01), 781 So.2d 1239; State v. McKeel, 452 So.2d 1171 (La.1984); State v. Sloan, 32,101 (La.App.2d Cir.8/18/99), 747 So.2d 101.
It is clear from the evidence presented at trial that Mr. Camp was the person who made the phone call at issue to the Horseshoe Casino. Henson testified that Camp first had to identify himself and verify his information before determining if he had enough in his comp bucket to entitle him to a free meal.
The only defense witness to testify as to the actual exchange between Henson and Camp was Camp's wife, Rolene Camp. Mrs. Camp testified that she was in the same room as her husband when the phone conversation took place. Although she admitted that he became frustrated, she never heard him threaten to burn down the casino. The only thing she recalled him saying was that the "state would be better off if we never had the casinos."
The state presented the testimony of Henson, as well as four other witnesses who had knowledge of the incident, including: Rosia Warren, Henson's manager who testified that Henson was visibly upset after the phone conversation; Destry Thompkins, the on-duty security guard who responded to Henson's complaint and took her statement shortly after the phone conversation took place; Frank Webb, an investigator in Horseshoe Casino's security division; and Trooper Krouse, an officer in the Gaming Division of the Louisiana State Police who investigated the incident and ultimately arrested Camp.
The jury was additionally presented with evidence of three prior instances of similar misconduct exhibited by Camp. In June of 2007, Camp was arrested and charged with two counts of telephone harassment arising out of a phone call placed by Camp during a Minden telethon supporting St. Jude's Children's Research Hospital. Tina Haynes, a volunteer for the telethon, testified that she received a phone call from Camp, wherein he demanded to know which television personalities were appearing on the air at the time. After she informed him that it was certain city officials, he stated, "This is Charles Camp and I'm not going to give you any goddamn money if you have those goddamn criminals on your T.V." Haynes testified that this was emotionally upsetting because she had a child who was a patient at St. Jude's for two years and ultimately lost his battle with cancer. Lieutenant Dan Weaver, an investigator with the Minden Police Department, testified that Camp ultimately pled guilty to one count of telephone harassment and received a 60-day suspended sentence in addition to paying a fine and making a donation to St. Jude's.
Two Horseshoe employees then testified to the prior February of 2004 incident, which ultimately led to Camp's 24-hour eviction from the casino. The employees testified that on the date in question, *554 Camp was playing blackjack at the casino and refused to allow any other patrons to join the game. According to these witnesses, Camp was verbally abusive to the other customers and to the Horseshoe employees. He not only threatened physical violence, but also threatened to put the jobs of the Horseshoe employees in jeopardy. Camp was offered a private game, but refused to pay the minimum required. When his outbursts continued, he was escorted off the premises.
Lisa Copeland, a former executive assistant at the Inquisitor, a local newspaper, testified that on July 3, 2008, she received a phone call from Camp wherein he asked to speak with the publisher. Copeland informed Camp that the publisher was on vacation. Camp continued to call, and during one recorded conversation he stated, "I can buy that place and blow it off the, up-burn it up." The recorded call was played for the jury. Copeland testified that after this exchange, the Inquisitor installed additional security measures, including extra outside cameras.
In his appellate brief, Camp argues that the State offered no evidence to prove beyond a reasonable doubt that the threat was not true. Knowledge that the threat was false is an essential element of the offense under the statute. Here, the jury reasonably concluded that Camp did not actually plan to go to the Casino's property and burn it down. Camp, who was 73 years old at the time of the arrest, had a propensity to make hot-tempered phone calls. He did not take steps and follow through on this threat against Horseshoe. Thus, the evidence demonstrates beyond reasonable doubt that Camp intended to convey a false threat.
Camp further argues that the incorporation of the words "I ought to" in his threat negates the possibility of an actual or false threat. Camp cites Thompkins' incident report, taken approximately 12 minutes after the call, which reflects that Camp told Henson, "I ought to burn that mf______ down." In addition to the "I ought to" account of the threat in Thompkins' report, Henson also provided a written statement and testified at trial. In both her written statement taken by Trooper Krouse and in her testimony at trial, Henson conveyed that Camp said, "I'm going to come down there and burn that goddamn place down and you." Moreover, upon being questioned by the assistant district attorney, Thompkins testified that his report was simply a brief summation of what occurred. In any event, the jury considered all accounts of Henson's phone conversation with Camp. The "ought to" language, if true, does not by itself become the measure of the threat which Henson perceived and then reported to her employer. Camp's overall statements to her could be viewed by the jury as a threat which alarmed her and Horseshoe.
Camp also points to the fact that Henson "hung up the phone midway into the conversation" leaving "the jury to speculate on how the conversation was going to end." However, the threat of arson was clearly communicated before the exchange concluded. Given Camp's proclivity to making alarming phone calls, the jury could have reasonably concluded that he intended to communicate a false threat to burn down the casino, despite the curtailment of the conversation.
Although Camp points out that Henson was not frightened by the exchange, only "uncomfortable," the wording of this statute does not make the crime depend on causing actual fear or creating a condition of public disruption. The crime is complete with the verbal act of conveyance of a false threat to another person, regardless of the impact that the utterance may have *555 on the particular person who receives it. State ex rel. R.T., supra.
From the evidence, the jury could have reasonably concluded that Camp intentionally made a telephone call to the Horseshoe to communicate a false threat of burning down the casino.

II.
Camp makes two assignments of error pertaining to the state's use of "other crimes, wrongs or acts" evidence. Camp first argues that reference to "other crimes, wrongs or acts" evidence during voir dire by the state effectively denied him his right to a fair trial. During the state's voir dire examination, the assistant district attorney informed the jury of his intention to use other crimes evidence. He explained that the purpose of presenting this type of evidence was not to show that the defendant was a bad person, but rather it was only permissible to show "intent, absence of mistake [and] planned patterns of behavior." He then gave an example of the use of past behavior evidence proving motive, plan or absence of mistake. The defense additionally asked questions to the potential jurors relating to other crimes evidence.
From the record of this voir dire examination, however, there is an absence of any attempt on behalf of the defense to raise an objection to such a line of questioning regarding the other crimes evidence. Louisiana's contemporaneous objection rule provides, "An irregularity or error cannot be availed of after a verdict unless it was objected to at the time of occurrence." La.C.Cr.P. art. 841(A); State v. Ruiz, 06-1755 (La.4/11/07), 955 So.2d 81; State v. Knott, 05-2252 (La.5/5/06), 928 So.2d 534. Defense counsel's failure to raise this issue during the voir dire portion of the trial now precludes such an argument on appeal.
Moreover, the scope of voir dire examination lies within the sound discretion of the trial court. State v. Roy, 95-0638 (La.10/04/96), 681 So.2d 1230, cert, denied, 520 U.S. 1188, 117 S.Ct. 1474, 137 L.Ed.2d 686 (1997); State v. Stucke, 419 So.2d 939 (La.1982); State v. Robinson, 404 So.2d 907 (La.1981). Reviewing courts owe a district judge's determinations on the scope of voir dire great deference and may not disturb them in the absence of a clear abuse of discretion. Id.
The defense next argues, as a separate assignment of error, that the trial court erred in generally allowing the introduction of other crimes evidence, placing particular emphasis on the 2004 Horseshoe eviction and the 2007 St. Jude's incident. Camp essentially argues that this evidence was highly prejudicial and that this prejudice clearly outweighed any probative value of the material.
Our law on other crimes evidence is well settled. Generally, evidence of other acts of misconduct is not admissible because it creates the risk that the defendant will be convicted of the present offense simply because the unrelated evidence establishes him or her as a "bad person." La. C.E. art. 404 B(1); State v. Jackson, 625 So.2d 146 (La. 1993). This rule of exclusion stems from the "substantial risk of grave prejudice to the defendant" from the introduction of evidence regarding his unrelated criminal acts. State v. Prieur, 277 So.2d 126 (La.1973). However, evidence of other crimes may be admissible if the state establishes an independent and relevant reason, i.e., to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. La. C.E. art. 404 B(1); State v. *556 Roberson, 40,809 (La.App.2d Cir.4/19/06), 929 So.2d 789. Even when the other crimes evidence is offered for a purpose allowed under Article 404, the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defense. The probative value of the extraneous crimes evidence must outweigh its prejudicial effect. La. C.E. art. 403; State v. Jacobs, 99-0991 (La.5/15/01), 803 So.2d 933, cert. denied, 534 U.S. 1087, 122 S.Ct. 826, 151 L.Ed.2d 707 (2002); State v. Hatcher, 372 So.2d 1024 (La.1979).
Prior to trial, the state provided Camp with notice, pursuant to State v. Prieur, supra, and La. C.E. art. 404(B), that it planned to use evidence of these prior acts at trial. In separate rulings, the trial court deemed admissible the 2004 Horseshoe eviction, the St. Jude's telephone call and the Inquisitor telephone call. The trial court denied certain other previous acts. A trial court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion. State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326, cert. denied, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996); State v. Caston, 43,565 (La. App.2d Cir.9/24/08), 996 So.2d 480; State v. Cooks, 36,613 (La.App.2d Cir. 12/4/02), 833 So.2d 1034.
The state argues and we agree that other crimes evidence was relevant for purposes other than to show that the defendant is a bad person. The crime of communicating of false information of planned arson requires proof that the offender intentionally made a false threat. The 24-hour eviction from the Horseshoe casino involved a false threat of physical violence toward employees and fellow patrons. It additionally involved the same establishment and therefore is relevant to show his intent and motive in making the arson threat in 2007. The call to the Inquisitor likewise involved a false threat of arson, almost identical to the call presently under review. The introduction of this evidence helped the state prove that his threat was not only false, but also intentional. Finally, the call to St. Jude for which Camp received a criminal conviction, was made only a few months prior to this incident. The call was relevant not only to show that Camp used the telephone to harass people, but also to establish a motive of instilling alarm. In addition, it is evidence that Henson did not mistake Camp's meaning or intent when he threatened to burn down the casino. This assignment lacks merit.

III.
Camp once again raises the issue of ineffective assistance of counsel on appeal. As previously noted, Camp retained new counsel after trial and a Motion for New Trial was filed. In the motion, it was alleged that Sugar not only failed to show up on time for trial, but also missed substantial portions of the trial. The motion additionally complained that despite exhaustive attempts by both defendant and co-counsel to meet with Sugar and prepare for trial, she was consistently unavailable.
The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by the Sixth Amendment to the U.S. Constitution. State v. King, 06-1903 (La.10/16/07), 969 So.2d 1228; State v. Wry, 591 So.2d 774 (La.App. 2d Cir.1991). A claim of ineffectiveness of counsel is analyzed under the two-prong test developed by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
To establish that his attorney was ineffective, the defendant first must show that counsel's performance was deficient. This requires a showing that counsel made errors *557 so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. The relevant inquiry is whether counsel's representation fell below the standard of reasonableness and competency as required by prevailing professional standards demanded for attorneys in criminal cases. Strickland, supra. The assessment of an attorney's performance requires his conduct to be evaluated from counsel's perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel's judgment, tactical decisions, and trial strategy, strongly presuming he has exercised reasonable professional judgment. State v. Grant, 41,745 (La. App.2d Cir.4/4/07), 954 So.2d 823, writ denied, 07-1193 (La.12/7/07), 969 So.2d 629; State v. Moore, 575 So.2d 928 (La.App. 2d Cir.1991). See also, State v. Tilmon, 38,003 (La.App.2d Cir.04/14/04), 870 So.2d 607, writ denied, 04-2011 (La.12/17/04), 888 So.2d 866.
Second, the defendant must show that counsel's deficient performance prejudiced his defense. This element requires a showing the errors were so serious as to deprive the defendant of a fair trial, i.e., a trial whose result is reliable. Strickland, supra. The defendant must prove actual prejudice before relief will be granted. It is not sufficient for the defendant to show the error had some conceivable effect on the outcome of the proceedings. Rather, he must show that but for counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. Strickland, supra; State v. Pratt, 26,862 (La.App.2d Cir.4/5/95), 653 So.2d 174, writ denied, 95-1398 (La.11/3/95), 662 So.2d 9. A defendant making a claim of ineffective assistance of counsel must identify certain acts or omissions by counsel which led to the claim; general statements and conclusory charges will not suffice. Strickland, supra; State v. Jordan, 35,643 (La.App.2d Cir.4/3/02), 813 So.2d 1123, writ denied, 02-1570 (La.5/30/03), 845 So.2d 1067.
A hearing was held on April 22, 2010, wherein both Camp and his previous counsel, Stephens, testified to Sugar's deficient performance. Subsequent to this hearing, the trial court denied defendant's motion, reasoning:
Mr. Camp had the luxury of having two attorneys at his table. Most persons only have one counsel at the table when they're trying a case.... Mr. Stephens was privy to all information. Mr. Stephens was designated as co-counsel for Mr. Camp. Mr. Stephens has testified that Ms. Sugar was available for all phases of the trial except for approximately two hours while Mr. Stephens took over the cross examination of the witnesses is what he's testified to. Ms. Sugar did the voir dire. She also cross examined most of the state's witnesses and she presented the defense as requested by Mr. Camp according to Mr. Stephens own testimony. . . . Mr. Camp had the representation of two attorneys, therefore, the Court hereby denies the motion for new trial and the verdict stands.
Insofar as the issues raised in the motion for new trial are concerned, we have reviewed the trial record and agree with the trial court that the defendant's two attorneys performed adequately during the actual trial stage. Sugar and Stephens collectively questioned witnesses both on direct and cross-examination and made thoughtful objections throughout the trial. Sugar additionally gave thorough opening and closing statements. Thus, the trial court's ruling on the motion for new trial was not in error.
Nevertheless, although not raised at the hearing on the motion for new trial, Camp *558 now asserts in his brief that Sugar's representation was also ineffective due to her failure to question two prospective jurors during voir dire. During the state's questioning of these two potential jurors, it is evident that Sugar was out of the courtroom; however, it is not apparent when exactly she returned and how much of the state's examination of these two jurors she actually heard. Nonetheless, when the state concluded, Sugar rose and stated, "I don't have any questions for these individuals, thank you."
At this point in the record, there is no evidence that Sugar's decision not to question these prospective jurors was based on anything other than her decision that these jurors were unbiased. However, a sidebar conference was held, in which Sugar revealed that she was in a rush to get home and say goodbye to her children before they left for vacation. The court asked Sugar if she had any peremptory challenges that she wanted to exercise and she responded "not if you're going to go to midnight." After Sugar announced she had no peremptory challenges, the court declared that the jury had been chosen.
Thereafter, two alternate jurors were sworn and questioned by the state and by Sugar. Both the state and the defendant exercised a peremptory challenge against one of the potential jurors, leaving one open spot. The court then informed the parties that another prospective alternate would be called for questioning, to which Sugar replied, "Now who's dragging it out?" At this point, Sugar suggested that the parties agree to have only one alternate juror and the state agreed.
On the face of the record, it is unclear whether Sugar's and Stephens' failure to question these jurors was part of their overall trial strategy. State v. Grant, supra; see also, Teague v. Scott, 60 F.3d 1167 (5th Cir.1995) (a strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness).
Thus, we conclude that any issue involving the voir dire examination, or lack thereof, would be better addressed in a post-conviction relief proceeding, where a full evidentiary hearing with testimony by Sugar can be held under La.C.Cr.P. art. 930. State ex rel. Bailey v. City of West Monroe, 418 So.2d 570 (La.1982); State v. Ellis, 42,520 (La.App.2d Cir.9/26/07), 966 So.2d 139, writ denied, 07-2190 (La.4/4/08), 978 So.2d 325. Such a setting would afford Sugar and her co-counsel the opportunity to present testimony and other evidence regarding the conduct of the voir dire examination.
For the foregoing reasons, Camp's conviction and sentence are affirmed.
AFFIRMED.
STEWART, J., concurs with reasons.
STEWART, J., concurring.
I agree with the majority opinion as to the issues concerning the sufficiency of the evidence and the other crimes evidence. However, I disagree with its handling of the ineffective assistance of counsel issue.
The majority opinion addresses and affirms the trial court's denial of the defendant's motion for a new trial, which was based on the alleged ineffectiveness of trial counsel, Melissa Sugar. However, it then concludes that the claim regarding Sugar's conduct during voir dire would be better addressed in a post-conviction relief proceeding. As recognized in the majority opinion, ineffective assistance of counsel claims are best handled in post-conviction relief proceedings, which provide the opportunity for a full evidentiary hearing. State v. Drake, 45,172, p. 13 (La.App.2d Cir.5/19/10), 37 So.3d 582, 590, writ denied, *559 2010-1468 (La.1/14/11), 52 So.3d 899. Sugar was suspended from the practice of law on an interim basis by the Louisiana Supreme Court pursuant to order No. 2010-B-0516, dated June 2, 2010. This occurred a very short time after the defendant's trial and raises questions about her competency in conducting the trial. If and when the defendant files an application for post-conviction relief, the scope of his ineffective assistance of counsel claim should not be limited to addressing only the conduct of voir dire.
For these reasons, I would pretermit any ruling on the ineffective assistance of counsel claims asserted on appeal and await a full hearing upon the filing of post-conviction relief.
APPLICATION FOR REHEARING
Before STEWART, CARAWAY, PEATROSS, MOORE and LOLLEY, JJ.
Rehearing denied.
STEWART, J., would grant rehearing for the reasons assigned in majority opinion.
MOORE, J., would grant rehearing.
NOTES
[1] The initial charge was brought by the Bossier Parish District Attorney's office. However, Camp subsequently filed a civil suit against the Bossier Parish DA in federal court and on October 10, 2007, the DA recused himself. The Caddo Parish District Attorney was then appointed as special prosecutor for the 26th Judicial District.